POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Movant Rahul Patange and
Proposed Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JARROD PARKS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOLDEN HEAVEN GROUP HOLDINGS LTD., QIONG JIN, and JINGUANG GONG,<br><br>Defendants. | Case No. 2:23-cv-10619-HDV-SK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RAHUL PATANGE FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD COUNSEL**<br><br>DATE:  April 4, 2024<br>TIME:  10:00 a.m.<br>JUDGE:  Hernán D. Vera<br>CTRM:  5B |

MEMORANDUM OF POINTS AND AUTHORITIES - 2:23-cv-10619-HDV-SK; 2:24-cv-00423-HDV-SK

MAHAFUJUR RAHMAN, Individually and on behalf of all others similarly situated,

        Plaintiff,

        v.

GOLDEN HEAVEN GROUP HOLDINGS LTD., QIONG JIN, and JINGUANG GONG,

        Defendants.

Case No. 2:24-cv-00423-HDV-SK

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................2

II.   STATEMENT OF FACTS .............................................................................3

III.  ARGUMENT ..............................................................................................12

    A.    THE RELATED ACTIONS SHOULD BE CONSOLIDATED FOR ALL PURPOSES.................................................................................12

    B.    PATANGE SHOULD BE APPOINTED LEAD PLAINTIFF...............13

        1.    Patange Is Willing to Serve as Class Representative........................ 15

        2.    Patange Has the "Largest Financial Interest"................................... 15

        3.    Patange Otherwise Satisfies the Requirements of Rule 23 ............. 16

        4.    Patange Will Fairly and Adequately Represent the Interests of the Class and Is Not Subject to Unique Defenses ......... 19

    C.    LEAD PLAINTIFF'S SELECTION OF COUNSEL SHOULD BE APPROVED ..........................................................................................20

IV.   CONCLUSION............................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..............................................................................17

*Hessefort v. Super Micro Comput., Inc.*,
    317 F. Supp. 3d 1056 (N.D. Cal. 2018)...............................................................17

*In re Solar City Corp. Sec. Litig.*,
    No. 16-CV-04686-LHK, 2017 WL 363274 (N.D. Cal. Jan. 25, 2017)..............17

*Jarrod Parks v. Golden Heaven Group Holdings Ltd. et al.*,
    No. 2:23-cv-10619 (C.D. Cal.) .......................................................................1, 5

*Knox v. Yingli Green Energy Holding Co.*,
    136 F. Supp. 3d 1159 (C.D. Cal. 2015) ..............................................................16

*Lax v. First Merchants Acceptance Corp.*,
    Nos. 97 C 2715 *et al.*, 1997 U.S. Dist. LEXIS 11866 (N.D. Ill. Aug. 6,
    1997) ..............................................................................................................15, 16

*Mahafujur Rahman v. Golden Heaven Group Holdings Ltd. et al.*,
    No. 2:24-cv-00423 (C.D. Cal.) ..................................... 1, 3, 4, 5, 6, 7, 8, 10, 12

*Osher v. Guess?, Inc.*, No. CV01-00871LGB(RNBX), 2001 WL 861694
    (C.D. Cal. Apr. 26, 2001) ...................................................................................20

*Richardson v. TVIA, Inc.*,
    No. C 06 06304 RMW, 2007 WL 1129344 (N.D. Cal. Apr. 16, 2007) .......13, 17

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ..............................................................................18

**Statutes**

15 U.S.C. §78j(b) ..............................................................................................13

15 U.S.C. §78t(a) ..............................................................................................13

15 U.S.C. § 78u-4...............................................................................1, 2, 13, 19

Private Securities Litigation Reform Act of 1995 .................. 1, 2, 13, 14, 16, 19, 20

Securities Exchange Act of 1934 ....................................................................1, 2, 18

**Rules**

Fed. R. Civ. P. 23 ..................................................... 2, 3, 13, 14, 16, 17, 18

Fed. R. Civ. P. 42 ......................................................................................1, 2, 13

Movant Rahul Patange ("Patange") respectfully submits this Memorandum of Points and Authorities in support of his motion, pursuant to Federal Rule of Civil Procedure 42 ("Rule 42") and Section 21D(a)(3) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), for the entry of an Order: (1) consolidating the above-captioned related actions (the "Related Actions"); (2) appointing Patange as Lead Plaintiff on behalf of a class (the "Class") consisting of persons or entities who purchased or otherwise acquired publicly traded Golden Heaven Group Holdings Ltd. ("Golden Heaven" or the "Company") securities between April 13, 2023 and December 8, 2023, inclusive (the "Class Period"); and (3) approving proposed Lead Plaintiff's selection of Pomerantz LLP ("Pomerantz") as Lead Counsel for the Class.[1]

---

[1] On December 19, 2023, the first-filed of the Related Actions was filed in this Court, styled *Jarrod Parks v. Golden Heaven Group Holdings Ltd. et al.*, No. 2:23-cv-10619 (C.D. Cal.) ("*Parks*"), alleging a class period including persons or entities who purchased or otherwise acquired publicly traded Golden Heaven securities between April 13, 2023 and November 13, 2023, inclusive. *See* Dkt. No. 1 at 1 ¶ 1. On January 17, 2024, a second action alleging substantially the same wrongdoing as *Parks* against the same defendants was filed in this Court, styled *Mahafujur Rahman v. Golden Heaven Group Holdings Ltd. et al.*, No. 2:24-cv-00423 (C.D. Cal.) ("*Rahman*"), alleging a larger class period including persons or entities who purchased or otherwise acquired publicly traded Golden Heaven securities between April 13, 2023 and December 8, 2023, inclusive. *See Rahman*, Dkt. No. 1 at 1 ¶ 1. Therefore, to avoid excluding any potential class members, this motion has adopted the largest class period alleged in *Rahman*.

## I.    PRELIMINARY STATEMENT

The Complaints in the Related Actions allege that the above-captioned defendants ("Defendants") defrauded investors in violation of the Exchange Act.  Golden Heaven investors, including Patange, incurred significant losses following the disclosures of the alleged fraud, which caused the prices of Golden Heaven securities to fall sharply, damaging Patange and other Golden Heaven investors.

Consolidation is appropriate under Rule 42(a) where actions involve common questions of law or fact.  Here, the Related Actions are putative class actions alleging violations of the Exchange Act by the same defendants arising from substantially the same alleged fraud.  As such, the Related Actions involve common questions of both law *and* fact, and consolidation is plainly warranted.

Pursuant to the PSLRA, the Court is to appoint as Lead Plaintiff the movant that possesses the largest financial interest in the outcome of the Related Actions and that satisfies the requirements of Federal Rule of Civil Procedure 23 ("Rule 23").  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  During the Class Period, Patange purchased 72,805 publicly traded Golden Heaven shares, expended $1,389,585 on his transactions in publicly traded Golden Heaven securities, retained 72,805 of his publicly traded Golden Heaven shares, and, as a result of the disclosures of Defendants' alleged fraud, incurred losses of approximately $1,327,170.  *See* Declaration of Jennifer Pafiti in Support of Motion ("Pafiti Decl."), Exhibit ("Ex.") A at *2.  Accordingly, Patange believes that he

has the largest financial interest in the relief sought in the Related Actions. Beyond his considerable financial interest, Patange also meets the applicable requirements of Rule 23 because his claims are typical of absent Class members and because he will fairly and adequately represent the interests of the Class.

To fulfill his obligations as Lead Plaintiff and vigorously prosecute the Related Actions on behalf of the Class, Patange has selected Pomerantz as Lead Counsel for the Class. Pomerantz is highly experienced in the area of securities litigation and class actions and has successfully prosecuted numerous securities litigations and securities fraud class actions on behalf of investors, as detailed in the firm's resume.

Accordingly, Patange respectfully requests that the Court enter an Order consolidating the Related Actions, appointing Patange as Lead Plaintiff for the Class, and approving his selection of Pomerantz as Lead Counsel for the Class.

## II.    STATEMENT OF FACTS

As alleged in the Complaints in the Related Actions, Golden Heaven has stated that it "manages and operates six properties consisting of amusement parks, water parks, and complementary recreational facilities" and that "[t]he parks provide a wide range of exciting and entertaining experiences, including thrilling rides, family-friendly attractions, water attractions, gourmet festivals, circus performances, and high-tech facilities." Dkt. No. 1 at 2 ¶ 7; *Rahman*, Dkt. No. 1 at 4 ¶ 15. The Company conducts its operations through operating entities in China. Dkt. No. 1 at 2 ¶ 8; *Rahman*, Dkt. No. 1 at 4 ¶ 15.

Golden Heaven's shares trade on the NASDAQ exchange under the ticker symbol "GDHG". Dkt. No. 1 at 2 ¶ 9; *Rahman*, Dkt. No. 1 at 2 ¶ 7.

Throughout the Class Period, Defendants made materially false and/or misleading statements because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: (1) Golden Heaven's amusement parks are in generally poor condition; (2) Golden Heaven materially overstated the number of visitors to its amusement parks and overall growth prospectsl; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. *See* Dkt. No. 1 at 11-12 ¶ 48; *Rahman*, Dkt. No. 1 at 13-14 ¶ 44.

On November 13, 2023, during market hours, Hindenburg Research ("Hindenburg") posted on X.com (formerly known as Twitter) a series of posts under the heading "NEW FROM US: We Are Short Golden Heaven Group, Another Classic 'China Hustle'". Dkt. No. 1 at 12 ¶ 49; *Rahman*, Dkt. No. 1 at 14 ¶ 45.

Hindenburg first noted that Golden Heaven purportedly operates six properties in southern China, including amusement parks, water parks and recreational facilities. Dkt. No. 1 at 12 ¶ 50; *Rahman*, Dkt. No. 1 at 14 ¶ 46. Hindenburg then noted that Golden Heaven's share price has dramatically gone up in value since the Company's April 2023

initial public offering, despite little news to justify the gains.  Dkt. No. 1 at 12 ¶ 51; *Rahman*, Dkt. No. 1 at 14 ¶ 46.

Hindenburg then noted how Golden Heaven had claimed that, in 2022, it had hosted 2.41 million guests across its 6 parks, driving over $41.8 million in revenue for the 2022 fiscal year.  Dkt. No. 1 at 13 ¶ 52; *Rahman*, Dkt. No. 1 at 15 ¶ 47.  Hindenburg stated that these were "hardly levels" that would justify the Company's $1.2 billion market capitalization as of November 12, 2023.  Dkt. No. 1 at 13 ¶ 52; *Rahman*, Dkt. No. 1 at 15 ¶ 47.

Hindenburg then stated that its research showed that Golden Heaven's Chief Executive Officer, Defendant Qiong Jin ("Jin"), has "a history of undisclosed fraud allegations and asset freezes in China", that "[t]he company was taken public by securities firms with multiple FINRA infractions" and that Golden Heaven's "***claimed high-tech parks appear to be dystopian hellscapes***" (emphasis added).  Dkt. No. 1 at 13 ¶ 53; *Rahman*, Dkt. No. 1 at 15 ¶ 48.

Hindenburg then referenced how Defendant Jin and her husband were accused of defrauding Chinese investors in Fujian Haichuan Pharmaceutical Technology Development Co., Ltd., a company that they controlled.  Dkt. No. 1 at 13 ¶ 54; *Rahman*, Dkt. No. 1 at 16 ¶ 49.  According to Hindenburg, "[u]npaid judgments from the alleged fraud resulted in Jin Qiong being restricted from travel [. . .]."  Dkt. No. 1 at 14 ¶ 54; *Rahman*, Dkt. No. 1 at 16 ¶ 49.

Hindenburg then stated "[w]e visited each [Golden Heaven] park on the weekend, typically when amusement parks are busiest, expecting to find vibrant and heavily trafficked parks as suggested in the company's investor materials." Dkt. No. 1 at 14 ¶ 55; *Rahman*, Dkt. No. 1 at 16 ¶ 50.

In particular, Hindenburg noted that Golden Heaven's largest park (by number of guests), Yueyang Amusement World ("Yueyang Park"), accounted for 36% of total guests. Dkt. No. 1 at 14 ¶ 56; *Rahman*, Dkt. No. 1 at 16 ¶ 51. Hindenburg stated that "[a]ccording to the company, [Yueyang] had 890,000 guests in 2022, or 2,400/day, despite having just a 1,100 guest capacity[.]" Dkt. No. 1 at 14 ¶ 56; *Rahman*, Dkt. No. 1 at 16 ¶ 51.

In contrast to Golden Heaven's claims about Yueyang Park, Hindenburg stated that its investigator visited the property on a Saturday and observed only "***about 10 cars in the lot around noon***", and that the amusement park was nearly empty (emphasis added). Dkt. No. 1 at 15 ¶ 57; *Rahman*, Dkt. No. 1 at 17 ¶ 52.

Hindenburg noted that a "water attraction" was a "large pond full of trash[.]" Dkt. No. 1 at 15 ¶ 58; *Rahman*, Dkt. No. 1 at 17 ¶ 53.

Hindenburg then discussed Golden Heaven's second largest park by number of guests, the Changde Jinsheng Amusement Park ("Changde Jinsheng"), which Hindenburg stated had accounted for 21% of guests across all parks. Dkt. No. 1 at 15 ¶ 59; *Rahman*, Dkt. No. 1 at 18 ¶ 54. Hindenburg stated that "[w]e visited [Changde Jinsheng] on a

Sunday at around 10am" and that "*[t]here were about 20 cars in the lot and slightly more visitors*" (emphasis added).  Dkt. No. 1 at 16 ¶ 59; *Rahman*, Dkt. No. 1 at 18 ¶ 54. Hindenburg then showed images of the park with very few guests on rides, calling into question Golden Heaven's claims about its visitor numbers.  Dkt. No. 1 at 16 ¶ 59; *Rahman*, Dkt. No. 1 at 18-19 ¶ 54.

Hindenburg then noted that Golden Heaven's third largest park, the Yunnan Yuxi Jinsheng Amusement Park ("Yunnan Yuxi Park"), which purportedly accounted for 16% of total guests in 2022, had a reported 370,000 guests in 2022, an average of a little over 1,000 guests per day.  Dkt. No. 1 at 16 ¶ 60; *Rahman*, Dkt. No. 1 at 19 ¶ 55.

Hindenburg revealed that its investigator arrived at the Yunnan Yuxi Park "around 9am on a Saturday, and stayed for around 7 hours."  Dkt. No. 1 at 16 ¶ 61; *Rahman*, Dkt. No. 1 at 19 ¶ 56.  Further, "[t]he investigator checked the parking lot roughly every hour" and "[t]he checks show activity peaked at around 63 cars in the afternoon."  Dkt. No. 1 at 16-17 ¶ 61; *Rahman*, Dkt. No. 1 at 19-20 ¶ 56.  Hindenburg then included an image in its posts, showing that the Yunnan Yuxi Park was uncrowded on a Saturday.  Dkt. No. 1 at 17 ¶ 61; *Rahman*, Dkt. No. 1 at 20 ¶ 56.

Hindenburg then noted that Tongling West Lake Amusement World ("Tongling West Lake"), Golden Heaven's 4th largest park, which purportedly accounted for 15% of Golden Heaven's total guests in 2022, had a *'water feature' which was a "small blow-up*

*pool with dirty water in what seemed to be a far larger, otherwise empty pool structure*" (emphasis added).  Dkt. No. 1 at 17 ¶ 62; *Rahman*, Dkt. No. 1 at 20 ¶ 57.

According to Hindenburg, Golden Heaven's next-largest amusement park is the Qujing Jinsheng Amusement Park.  Dkt. No. 1 at 18 ¶ 63; *Rahman*, Dkt. No. 1 at 21 ¶ 58. Hindenburg stated that it "*counted a maximum of 44 cars in the parking lot during late morning and early afternoon*" and that "[a]n attendant told our investigator *that the park was as 'busy as it normally was'*" (emphases added).  Dkt. No. 1 at 18 ¶ 63; *Rahman*, Dkt. No. 1 at 21 ¶ 58.

Golden Heaven's sixth largest park by attendance, the Mangshi Jinsheng Amusement Park, is temporarily closed as of September 30, 2023.  Dkt. No. 1 at 18 ¶ 64; *Rahman*, Dkt. No. 1 at 21 ¶ 59.  However, while Hindenburg noted that Golden Heaven disclosed that the park has been closed since September 30, 2023, Hindenburg found evidence that this particular park has been closed for a longer-than-disclosed period of time.  Dkt. No. 1 at 18 ¶ 64; *Rahman*, Dkt. No. 1 at 21-22 ¶ 59.

In particular, Hindenburg found that the park had been "overgrown with mature weeds and other signs of long-term deterioration", providing images of the park.  Dkt. No. 1 at 19 ¶ 65; *Rahman*, Dkt. No. 1 at 22 ¶ 59.

On this news, the price of Golden Heaven stock declined by $6.63 per share, or 27.9%, on high trading volume, to close at $17.12 per share on November 13, 2023.  Dkt. No. 1 at 21 ¶ 66; *Rahman*, Dkt. No. 1 at 24 ¶ 60.

On November 16, 2023, during pre-market hours, Golden Heaven issued a response to Hindenburg's allegations in a press release (the "November 16 Press Release"), entitled "Golden Heaven Group Holdings Ltd. Offers Response to Deceptive, Fabricated Postings", which largely failed to address, much less rebut, Hindenburg's allegations, merely stating, in relevant part:

Golden Heaven Group Holdings Ltd. (the "Company" or "Golden Heaven") (Nasdaq: GDHG), an amusement park operator in China, issued the following statement in response to baseless allegations that appeared on certain websites believed to be supported and working in concert with short sellers. Golden Heaven strongly believes that the carelessly assembled report contains numerous errors of facts, misleading speculations and malicious interpretations of events surrounding the Company's operations.

The report presents both an array of factual errors and numerous inflammatory and misleading statements demonstrating a fundamental lack of understanding of the Company financial statements and our business. Moreover the report was designed to encourage market fear by taking unsubstantiated and uncorroborated pictures and assertions that are designed to cause fear and panicked selling in a global capital market that is already precarious.

Golden Heaven's Board of Directors has been informed of the allegations and will consider and decide on the necessary and appropriate course of action in response to the allegations. ***Golden Heaven will release additional, detailed information concerning the allegations in due course.*** The Company is committed to providing full and accurate disclosure to investors and to rebutting any false claims that attempt to undermine confidence in its business, management, operations and prospects. The Company is planning on launching a full investigation and holding those behind these baseless attacks responsible.

The Company's management and Board of Directors wishes to thank its loyal shareholders who were able to tell the truth from the baseless scare tactics that has kept the stock price stable.

(Emphasis added.) *Rahman*, Dkt. No. 1 at 24-25 ¶ 61.

Following publication of the November 16 Press Release, in apparent response to the Company's lack of a detailed rebuttal, Golden Heaven's stock price fell $1.35 per share, or 6.83%, to close at $18.43 per share on November 16, 2023. *Id.*, Dkt. No. 1 at 25 ¶ 62.

On December 6, 2023, during after-market hours, and still without having issued a more detailed response to Hindenburg's allegations—despite the Company stating it would do so nearly two months earlier in the November 16 Press Release—Golden Heaven issued another press release (the "December 6 Press Release"), entitled "Golden Heaven Group Holdings Ltd. Intends to Enter into an Operating Lease Framework Agreement with a Top-tier Chinese Amusement Group", the contents of which signaled to investors that Golden Heaven could not rely on its own amusement parks to fuel the Company's desired business growth and market position in China. *Id.*, Dkt. No. 1 at 25 ¶ 63. Specifically, the December 6 Press Release stated, in relevant part:

> Golden Heaven Group Holdings Ltd. (the "Company" or "Golden Heaven") (Nasdaq: GDHG), an amusement park operator in China, today announced that it intends to enter into an operating lease framework agreement (the "Agreement") with a top-tier Chinese amusement group (the "Group"). The Group is a subsidiary of a prominent Chinese tourism group, ranking among China's top 30 national cultural enterprises and top 20 tourism groups. This Agreement is expected to mark a significant step in Golden Heaven's strategic business expansion efforts, and is aimed at enhancing Golden Heaven's market position by leveraging the Group's strong presence in the Chinese amusement park industry.

> Pursuant to the Agreement, that is presently under negotiation, the Group's theme park in Wuhan, Hubei Province in central China is expected to become the pilot leased park to the Company. The finalized operating lease rights, lease schedules and other terms of the Agreement will be settled with the ongoing negotiation.
>
> [Defendant] Jin . . . commented, "We are thrilled to collaborate with an established player in the amusement park business. We anticipate that the proposed Agreement we are negotiating will assist us in our journey for market expansion in China and believe it may pave the way for more strategic partnerships in the near future. By drawing on the strengths of our partner, who we understand has a market base in many large cities in China, we hope to accelerate our expansion and elevate our guest experiences. We believe that the cooperation is in our long-term interests for building brand recognition, sustaining our competitiveness, and creating value for our shareholders."

*Id.*, Dkt. No. 1 at 25-26 ¶ 63.

Following publication of the December 6 Press Release, Golden Heaven's stock price fell $18.76 per share, or **_88.99%_**, to close at $2.32 per share on December 7, 2023. *Id.*, Dkt. No. 1 at 26 ¶ 64.

Then, on December 8, 2023, during market hours, *Bloomberg* published an article (the "Bloomberg Article"), entitled "Chinese Amusement Park Falls 90% a Month After Hindenburg Short" (subsequently updated to "Chinese Park Owner Falls 93% a Month After Hindenburg Short"), which, in addition to commenting on Golden Heaven's recent sharp share price decline on December 7, 2023, quoted an email from Hindenburg's founder, stating, *inter alia*:

> **_"Unfortunately, the Nasdaq exchange is littered with dozens of obvious China-based scams. These companies commonly lure in unsuspecting U.S. retail investors through Telegram, Discord, or WhatsApp chat groups then exit through the kind of 'rug pull' decline we are seeing with Golden_**

*Heaven," Anderson, founder of Hindenburg Research, said in an email, adding that he has raised the issue with Nasdaq.*

Golden Heaven Group did not respond to a Bloomberg News request for comment outside of its normal business hours.

Earlier this week, Golden Heaven Group announced strategic initiatives to expand its business, and said it intends to enter into an operating lease framework agreement with an unnamed top-tier Chinese amusement group.

(Emphasis added.)  *Id.*, Dkt. No. 1 at 26-27 ¶ 65.

Following publication of the Bloomberg Article, Golden Heaven's stock price fell $0.96 per share, or 41.38%, to close at $1.36 per share on Friday, December 8, 2023.  *Id.*, Dkt. No. 1 at 27 ¶ 66.  The Company's stock price continued to fall the following trading session by $0.05 per share, or 3.68%, to close at $1.31 per share on Monday, December 11, 2023.  *Id.*

As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, the plaintiffs in the Related Actions and other Class members have suffered significant losses and damages.  *See* Dkt. No. 1 at 21 ¶ 67; *Rahman*, Dkt. No. 1 at 27 ¶ 67.

## III.   ARGUMENT

### A.   THE RELATED ACTIONS SHOULD BE CONSOLIDATED FOR ALL PURPOSES

Consolidation of cases is proper where, as here, the actions involve common questions of law and fact such that consolidation would prevent unnecessary cost or delay in adjudication.  When actions involving a common question of law or fact are pending

before the court, it may order a joint hearing or trial of any or all of the matters at issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay. Fed. R. Civ. P. 42(a); *see also Richardson v. TVIA, Inc.*, No. C 06 06304 RMW, 2007 WL 1129344, at *2 (N.D. Cal. Apr. 16, 2007) (consolidating two securities class actions governed by the PSLRA that "present common questions of law and fact").

The PSLRA contemplates consolidation where "more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed." 15 U.S.C. § 78u-4(a)(3)(B)(ii). As such, the PSLRA does not displace the traditional legal standards for consolidation under Rule 42(a).

Each of the Related Actions has been filed in this District alleging similar factual and legal grounds to support allegations of violations of Sections 10(b) and 20(a) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder, by the same Defendants arising from the public dissemination of false and misleading information to investors. Accordingly, the Related Actions should be consolidated pursuant to Rule 42(a) for all purposes.

## B. PATANGE SHOULD BE APPOINTED LEAD PLAINTIFF

Patange should be appointed Lead Plaintiff because he has timely filed a motion for appointment as Lead Plaintiff, has the largest financial interest in the Related Actions to his knowledge, and otherwise strongly satisfies the requirements of Rule 23.

The PSLRA requires the plaintiff who files an action governed by its provisions to publish a notice (the "Notice") to the class within 20 days of filing the action, informing putative class members of: (1) the pendency of the action; and (2) their right to file a motion for appointment as lead plaintiff within 60 days after publication of the Notice. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i). In addition, the PSLRA directs courts to consider any motion to serve as lead plaintiff filed by class members in response to the Notice and to do so by the later of (1) 90 days after the date of publication, or (2) as soon as practicable after the Court decides any pending motion to consolidate. *See id.* § 78u-4(a)(3)(B).

Pursuant to the PSLRA, the Court "shall appoint" the "most adequate plaintiff" to serve as lead plaintiff. *Id.* § 78u-4(a)(3)(B)(i). The PSLRA provides a "[r]ebuttable presumption" that the "most adequate plaintiff" is the person or group that:

> (aa) has either filed the complaint or made a motion in response to a notice . . .;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u-4(a)(3)(B)(iii)(I).

As set forth below, Patange satisfies all three of these criteria and thus is entitled to the presumption that he is the most adequate plaintiff of the Class and, therefore, should be appointed Lead Plaintiff for the Class.

### 1.      Patange Is Willing to Serve as Class Representative

On December 19, 2023, counsel for plaintiff in the first-filed of the Related Actions caused the statutorily required Notice of that action to be published via *Business Wire* pursuant to Section 21D(a)(3)(A)(i) of the PSLRA, which announced that a securities class action lawsuit had been filed on behalf of Golden Heaven investors, and which advised investors in Golden Heaven securities that they had until February 20, 2024—*i.e.*, 60 days from the date of the Notice's publication—to file a motion to be appointed as lead plaintiff. *See* Pafiti Decl., Ex. B at *2.

Patange has filed the instant motion pursuant to the Notice and has attached a sworn Certification executed by him attesting that he is willing to serve as a representative for the Class and to provide testimony at deposition and trial, if necessary. *See id.*, Ex. C at *2-3. Accordingly, Patange satisfies the first requirement to serve as Lead Plaintiff of the Class.

### 2.      Patange Has the "Largest Financial Interest"

The PSLRA requires a court to adopt a rebuttable presumption that "the most adequate plaintiff . . . is the person or group of persons that . . . in the determination of the court, has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii). To the best of his knowledge, Patange has the largest financial interest of any Golden Heaven investor or investor group seeking to serve as Lead Plaintiff based on the four factors articulated in the seminal case *Lax v. First Merchants Acceptance Corp.*:

(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period (also referred to as "retained shares"); (3) the total net funds expended during the class period; and (4) the approximate losses suffered.  No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 6, 1997).  In accord with courts nationwide, these so-called *Lax* factors have been adopted by courts in the Ninth Circuit, including in this District.  *See, e.g.*, *Knox v. Yingli Green Energy Holding Co.*, 136 F. Supp. 3d 1159, 1163 (C.D. Cal. 2015).  Of the *Lax* factors, courts in this Circuit tend to emphasize approximate loss in assessing a lead plaintiff movant's financial interest within the meaning of the PSLRA.  *See id.*

During the Class Period, Patange: (1) purchased 72,805 publicly traded Golden Heaven shares; (2) expended $1,389,585 on his transactions in publicly traded Golden Heaven securities; (3) retained 72,805 of his publicly traded Golden Heaven shares; and (4) as a result of the disclosures of Defendants' alleged fraud, incurred losses of approximately $1,327,170 in connection with his Class Period transactions in publicly traded Golden Heaven securities. *See* Pafiti Decl., Ex. A at *2.  To the extent that Patange possesses the largest financial interest in the outcome of this litigation, he is the presumptive "most adequate" plaintiff.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

### 3. Patange Otherwise Satisfies the Requirements of Rule 23

Section 21D(a)(3)(B)(iii)(I)(cc) of the PSLRA further provides that, in addition to possessing the largest financial interest in the outcome of the litigation, the Lead Plaintiff

must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure."  Rule 23(a) generally provides that a class action may proceed if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In making its determination that a lead plaintiff movant satisfies the requirements of Rule 23, the Court need not raise its inquiry to the level required in ruling on a motion for class certification; instead, a *prima facie* showing that the movant satisfies the requirements of Rule 23 is sufficient.  *See Hessefort v. Super Micro Comput., Inc.*, 317 F. Supp. 3d 1056, 1060-01 (N.D. Cal. 2018).  "This showing need not be as thorough as what would be required on a class certification motion and only needs to satisfy typicality and adequacy."  *In re Solar City Corp. Sec. Litig.*, No. 16-CV-04686-LHK, 2017 WL 363274, at *5 (N.D. Cal. Jan. 25, 2017).

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Richardson*, 2007 WL 1129344, at *4 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Patange's claims are typical of those of the Class.  Patange alleges, like other Class members, that Defendants violated the Exchange Act by making what they knew or should have known were false or misleading statements of material facts concerning Golden Heaven, or by omitting to state material facts necessary to make the statements they did make not misleading.  Patange, like other Class members, purchased publicly traded Golden Heaven securities during the Class Period at prices alleged to have been artificially inflated by Defendants' misrepresentations or omissions, and was damaged upon the disclosure of those misrepresentations and/or omissions that drove Golden Heaven's share price downward.  These shared claims, which are based on the same legal theory and arise from the same events and course of conduct as the Class's claims, satisfy the typicality requirement of Rule 23(a)(3).

In determining whether the adequacy of representation requirement of Rule 23(a)(4) is met, courts in the Ninth Circuit consider whether "the representative plaintiffs and their counsel have any conflicts of interest with other class members" and ask "will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citations omitted).

Patange is an adequate representative for the Class.  Here, Patange has submitted a signed Certification declaring his commitment to protect the interests of the Class.  *See* Pafiti Decl., Ex. C at *2-3.  There is no evidence of antagonism or conflict between Patange's interests and those of the Class, and Patange's significant financial interest

demonstrates that he has a sufficient interest in the outcome of this litigation to ensure vigorous advocacy.   Moreover, Patange has retained counsel highly experienced in vigorously and efficiently prosecuting securities class actions such as these Related Actions, and submits his choice of Pomerantz to the Court for approval as Lead Counsel pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).   In addition to Pomerantz, Patange is also represented by the Bronstein, Gewirtz & Grossman, LLC law firm in this litigation.

Further demonstrating his adequacy, Patange has submitted a signed Declaration attesting to, *inter alia*, his background, his investing experience, his understanding of the responsibilities of a Lead Plaintiff appointed pursuant to the PSLRA, his decision to seek appointment as Lead Plaintiff, and the steps that he is prepared to take to prosecute this litigation on behalf of the Class.  *See* Pafiti Decl., Ex. D at 1-4 ¶¶ 1-7, 9-11.

### 4. Patange Will Fairly and Adequately Represent the Interests of the Class and Is Not Subject to Unique Defenses

The presumption in favor of appointing Patange as Lead Plaintiff may be rebutted only upon proof "by a member of the purported plaintiff class" that the presumptively most adequate plaintiff:

(aa)   will not fairly and adequately protect the interest of the class; or

(bb)   is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Patange's ability and desire to fairly and adequately represent the Class has been discussed above.  Patange is not aware of any unique defenses Defendants could raise that

would render him inadequate to represent the Class. Accordingly, Patange should be appointed Lead Plaintiff for the Class.

### C.    LEAD PLAINTIFF'S SELECTION OF COUNSEL SHOULD BE APPROVED

The PSLRA vests authority in the Lead Plaintiff to select and retain Lead Counsel, subject to the approval of the Court. *See id.* § 78u-4(a)(3)(B)(v). The Court should interfere with a Lead Plaintiff's selection only when necessary to "protect the interests of the class." *Id.* § 78u-4(a)(3)(B)(iii)(II)(aa); *Osher v. Guess?, Inc.*, No. CV01-00871LGB(RNBX), 2001 WL 861694, at *4 (C.D. Cal. Apr. 26, 2001) ("A court may reject the lead plaintiff's choice only if it is necessary to protect the interests of the class.").

Here, Patange has selected Pomerantz as Lead Counsel for the Class. Pomerantz is highly experienced in the areas of securities litigation and class actions and has successfully prosecuted numerous securities litigations and securities fraud class actions on behalf of investors, as detailed in its firm resume submitted herewith. *See* Pafiti Decl., Ex. E at 1-11. In overview, Pomerantz is a premier firm in the area of securities litigation based in New York, with offices in Chicago, Los Angeles, Paris, France, London, the U.K., and Tel Aviv, Israel. *See id.* For more than 85 years, Pomerantz has represented defrauded investors. *See id.* at 1. As lead counsel in *In re Petrobras Securities Litigation*, No. 14-cv-09662 (S.D.N.Y.), Pomerantz secured a recovery of $3 billion on behalf of investors in the securities of Petrobras, the largest settlement ever in a class action involving a foreign issuer and the fifth largest class action settlement ever achieved in the

United States.  *See id.* at 2.  Petrobras is part of a long line of record-setting recoveries led by Pomerantz, including the $225 million settlement in *In re Comverse Technology, Inc. Securities Litigation*, No. 1:06-cv-01825 (E.D.N.Y.), in June 2010.  *See id.* at 1-11.  More recently, as Lead Counsel on behalf of a class of Fiat Chrysler Automobiles N.V. investors, Pomerantz reached a $110 million settlement on behalf of the class.  *See id.* at 2-3.

As a result of its extensive experience in litigation involving issues similar to those raised in these Related Actions, Patange's counsel, Pomerantz, has the skill, knowledge, expertise, and experience that will enable the firm to prosecute the Related Actions effectively and expeditiously.  Thus, the Court may be assured that by approving Patange's selection of Pomerantz as Lead Counsel, the members of the Class will receive the best legal representation available.

## IV.    CONCLUSION

For the foregoing reasons, Patange respectfully requests that the Court issue an Order: (1) consolidating the Related Actions; (2) appointing Patange as Lead Plaintiff for the Class; and (3) approving Pomerantz as Lead Counsel for the Class.

Dated:  February 20, 2024                    Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Movant Rahul Patange and Proposed Lead Counsel for the Class*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Movant Rahul Patange*

CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Jennifer Pafiti*
Jennifer Pafiti