UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


| | | |
|---|---|---|
| JARROD PARKS, | ) | Case No. CV 23-10619-HDV (SKx) |
| | ) | |
|     Plaintiff, | ) | Los Angeles, California |
| | ) | Thursday, January 30, 2025 |
|        v. | ) | 10:45 A.M. to 11:17 A.M. |
| | ) | |
| GOLDEN HEAVEN GROUP HOLDINGS | ) | |
| LTD., et al., | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HERNÀN D. VERA
UNITED STATES DISTRICT JUDGE


Appearances:              See Page 2

Deputy Clerk:             Wendy Hernandez

Court Reporter:           Recorded; CourtSmart

Transcription Service:    JAMS Certified Transcription
                          16000 Ventura Boulevard #1010
                          Encino, California  91436
                          (661) 609-4528


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For the Plaintiff:          Pomerantz LLP
                            By:   SAMANTHA DANIELS
                            600 Third Avenue, 20th Floor
                            New York, New York   10016
                            (212) 661-1100
                            sdaniels@pomlaw.com


For the Defendants:         Hunter Taubman Fischer and Li LLC
                            By:   MARK D. HUNTER
                                  JENNY JOHNSON-SARDELLA
                            848 Brickell Avenue, Suite 200
                            Miami, Florida   33131
                            (305) 629-1180
                            mhunter@htflawyers.com
                            jsardella@htflawyers.com

                            Michael Best and Friedrich LLP
                            By:   ANNE T. FREELAND
                            2750 Cottonwood Parkway, Suite 560
                            Cottonwood Heights, Utah   84121
                            (385) 695-6456
                            atfreeland@michaebest.com

                            K and L Gates LLP
                            By:   JONATHAN P. HERSEY
                            1 Park Place, 12th Floor
                            Irvine, California   92614
                            (949) 253-0900
                            jonathan.hersey@klgates.com

LOS ANGELES, CALIFORNIA, THURSDAY, JANUARY 30, 2025, 10:45 A.M.

THE CLERK:  Calling Item 3, Civil 23-10619, *Parks v. Golden Heaven Group.*

Counsel, please state your appearances.

MARK D. HUNTER:  Good morning, Your Honor. Mark David Hunter on behalf of Golden Heaven Group Holdings Limited.

THE COURT:  Good morning.

JENNY JOHNSON-SARDELLA:  Good morning, Your Honor. Jenny Johnson-Sardella on behalf of Defendant Golden Heaven Group Holdings Limited.

THE COURT:  Good morning.

SAMANTHA DANIELS:  Good morning, Your Honor.  This is Samantha Daniels of Pomerantz LLP for plaintiffs.

THE COURT:  Good morning.

MS. DANIELS:  Good morning.

JONATHAN P. HERSEY:  Good morning.  Jonathan Hersey of K and L Gates for -- excuse me -- Defendants Cogency Global Inc. and Colleen De Vries.

THE COURT:  Good morning.

ANNE T. FREELAND:  Good morning, Your Honor. Anne Freeland on behalf of Defendant R.F. Lafferty and Co.

THE COURT:  All right.  Good morning, everyone.  We are here on the various motions to dismiss the class action complaint here.

Now, I think for ease of analysis we can all agree that we have these claims under the Exchange Act and under the Securities Act. A few thoughts on each one; then I'll let everyone make their points on here.

I think the Exchange Act claims are -- I'm inclined to find -- I'm not ruling from the bench, but I'm inclined to find that they are amply pled. There's more than enough detail to satisfy Rule 9. There's a lot of detail there. I don't see any need for more, but I'll hear from anyone who wants to convince me otherwise.

The Securities Act claim is a bit tougher, though, because of its traceability requirement and what I -- what I'm struggling with on this, though, is that the prospectus talks about these other 50 million shares, but at least as alleged, there was a ton of fraud going on. So what's to say that wasn't fraudulent or that was a private issuance to the perpetrators of this? So do I really need to require plaintiff to trace these since there's no other evidence that there was a second or third registration? Can't I assume that it all ties back to the initial IPO back -- whenever it was -- six months before the plaintiff bought it later in that year, in 2023? If I dismiss those claims with to amend -- with a leave to amend, Ms. Daniels, what else would you proffer on that?

So let me hear from defense counsel. Whoever wants

to argue these points, come on up to the lectern, and I'll hear from you.

MR. HUNTER:  Thank you, Your Honor.

Ms. Sardella will argue the issue with the 33 Act claims, Your Honor.

THE COURT:  Okay.

MR. HUNTER:  My -- I'll be limited to the 10(b) and --

THE COURT:  Okay.

MR. HUNTER:  -- Rule 10b-5.

THE COURT:  Okay.

MR. HUNTER:  The sum and substance of the case, Your Honor, is that Golden Heaven acted fraudulently in three ways: they overstated the number of park guests and the resulting revenue; they inflated the number of employees maintaining the parks; and they misled the market about the true state of the parks, the rides, the features, et cetera, et cetera.

Now, when we take out the conclusory allegations and we get to the -- what I would call the "well pled" allegations, they cite the Hindenburg report, which is a report from a known, reported, open short seller, and then plaintiffs engaged in what they call their own independent investigation, and the issue with both of those -- for the Hindenburg is that they visited parks on one day in November,

the reports don't reflect anything about the weather conditions that day, the temperature, whether it was raining, whether it was snowing.  They just simply say, "We went on this day, and this is what we found."

THE COURT:  But literally a few dozen visitors, a parking lot that culminated 60 cars -- I mean, there's no way to square all of this.

MR. HUNTER:  Well, but there is, Your Honor.  That was one particular day.  It may have been a slow day at the park.  I mean, they happen.

THE COURT:  They talked to the employees who said, "This is what it's like every day."  So -- I mean, those are questions of fact later.  Maybe the employee was wrong but -- I mean, I don't know what else you would have them include in a complaint like this.

MR. HUNTER:  Well --

THE COURT:  They did their own investigation, they relied on another one, and they include massive amounts of detail.  I mean, so I don't understand what else you would have the Complaint say.

MR. HUNTER:  Well, I would have the Complaint say things that are not conclusory allegations because if you remove the Hindenburg report and you remove their own independent --

THE COURT:  Why would you remove the Hindenburg

report, though?

MR. HUNTER:  No, I'm saying, if you take that away, the rest of the allegations are conclusory.  The Hindenburg report speaks on those day at those times months after the prospectus, literally seven months after the prospectus.  The plaintiffs own investigation -- which, again, didn't speak to weather conditions.  They said, "We went on a certain day, and there was nobody there," et cetera, et cetera.  That's 13 months after the prospectus.  It's fraud by hindsight to say -- and they say at the bottom of page 14 of their Complaint, "Well, we found this 7 and 13 months later; so therefore they must have been overstating the numbers."

And I don't -- Your Honor, respectfully, I don't believe that meets the pleading requirement for fraud, and if you take those out and you look at the rest of the allegations -- and they get very colorful -- the "dystopian hellscape" and all of the language in the Complaint, but when you compare that with the actual pleading standard, they don't say near enough to support that fraud misstates -- excuse me -- misstatements were made on those dates, at those times, knowingly, with scienter when your best evidence is reports -- investigations that come months later on a particular day.

Now, if Your Honor would contrast that to a scenario where a company issues guidance that restates

earnings and issues nonreliance language and says, "These numbers on these days -- you can't rely on those," that we would understand, but this is a known short seller and a plaintiff that had already filed a complaint and was obviously doing an investigation to bolster its complaint, and even in their findings, there are holes such that you can't look back at those findings and say they support allegations leading all the way back in April of 2023.  And then when you then add the statements of puffery, the statements of enthusiasm, and the rest of the statements -- when Your Honor takes out those things that do not support fraud claims, I do not believe they pled enough for fraud, Your Honor.  That's our position, respectfully.

THE COURT:  Okay.  Very good.

MR. HUNTER:  And Ms. Sardella will address the Securities Act, Your Honor.

THE COURT:  All right.  Thank you.

MS. SARDELLA:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. SARDELLA:  With regard to Your Honor's question about the Securities Act claims, I think you've narrowed it kind of to the traceability question because even plaintiffs own Complaint concedes that the shares were not purchased at the offering; they were purchased several months later.  I would also note, Your Honor, that the shares were purchased

at a higher price than the offering shares.  So it's pretty narrow to the question of traceability.  The Ninth Circuit has already held that conclusory statements as to traceability, making the one-sentence statement that the shares were purchased either at an offering or traceable to that offering, is not adequate to state that the shares are traceable to that offering that's in connection with the alleged registration statement with false -- containing false statements.

With regard to the 50 million shares that were out, I think, arguably, Your Honor, that it's -- the plaintiff is asking the Court to only look at this one way, and the fact that there's 50 million shares that were outstanding, the fact that the plaintiff purchased these shares at a higher price allows the notion that these shares were not -- are not traceable without more -- without more facts alleged in the Complaint, these shares were not traceable back to the offering.

With regard to what further we would have the plaintiff state, I would argue that there needs to be more facts set out in the Complaint to clearly allow you to make that decision and not just to make the assumption that -- even at the motion to dismiss stage, to make the assumption that the shares only came from the offering with these 50 million shares that are outstanding, coupled with the fact

that they were purchased months later, coupled, again, with the fact that they were also purchased at a higher price than the initial offering.

I don't know if Your Honor has any further questions.  It's a pretty narrow --

THE COURT:  Yeah.

MS. SARDELLA:  -- question Your Honor asked.

THE COURT:  No.  I don't have anything further for you on that.  Anything else that you'd like to highlight on this point?

MS. SARDELLA:  Your Honor, further -- I mean, to highlight anything further beyond the issue of standing, which I think is the principal question here -- if Your Honor goes beyond that, I would then rely back on my colleague's arguments with regard to the sufficiency of the fraud claims because we also have the issue here in the Securities Act claims that are couched in fraud.  We don't believe that the plaintiff adequately alleged negligence here, that the same deficiencies that are in the 10(b)-10b-5 claims would then roll over to the Securities Act claims as well.

THE COURT:  Okay.

MS. SARDELLA:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

I'll give an opportunity for -- yes -- anyone else.

And when you go up, Ms. -- Ms. Freeland, you

represent Defendant Lafferty; correct?

MS. FREELAND:  Yes, Your Honor.  That's correct.

THE COURT:  Okay.

MS. FREELAND:  Thank you.  I'll be very brief.  I just wanted to clarify just a couple things as it pertains to my client.

So the only two claims that apply to R.F. Lafferty and Co. are the Section 12 and the Section 11.  As far as the Section 12, plaintiff has conceded that claim now, and although plaintiff voluntarily withdrew it in language in their motion, I would request that the Court enter an order so that it's clear in this case moving forward that the Section 12 claim is dismissed with prejudice.

That only leaves the Section 11 claim as it pertains to my client, and counsel has also already elaborated the main points on that.  The only thing I would request is that the Court -- I think the most helpful case on that is the Ninth Circuit *Century Aluminum* case, and there's language in that case that directly applies to this situation.  It's quoted in our brief.  It's the entirety of the language -- or the main point of the language is provided in a footnote on -- in our reply at page 3.

But it sets out this exact situation.  When there are allegations that could go either way, it's possible the shares were purchased at the IPO, it's possible that they

were purchased before or after from other outstanding shares, which is the situation we have here -- and that Ninth Circuit case specifically says, when the allegations are consistent with either explanation, if there's two possible explanations, it's not enough for plaintiff to just stand on that.  Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true.

There are no facts in the Complaint that exclude the possibility on the alternative explanation, and those needed to be included in the Complaint if they really, truly existed, and they are not.  So this is not sufficiently pled under *Twombly* or under the Ninth Circuit ruling.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Anything that you'd like to add?

MR. HERSEY:  No, Your Honor.  I'll rest on those arguments.  Thank you.

THE COURT:  Okay.  Very good.

All right.  Ms. Daniels?

MS. DANIELS:  Thank you, Your Honor.  I'll address the 10(b) arguments just briefly, first, and then get to the Section 11 claims.

As Your Honor said, in April 2023 Golden Heaven issued this IPO valued at $200 million.  They were lauding

the quality, the innovation, you know, the amount of their rides, the variety, the number of guests in, know, millions attending each year.  But in reality, as our independent investigators concluded, the parks are abandoned, deserted. The rides are rusty and idle.  They have been for a long time.  We have allegations that the condition of these parks didn't just happen after the April IPO, as defendants maintain.  We have photos showing rusty, rundown rides. Impressions from our investigators and the Hindenburg report saying, "These parks are abandoned.  This was a sham."

As Bloomberg later reported, this was unfortunately one of those classic China hustles, where, you know, Chinese foreign issuers seek, you know, listings on Nasdaq through a registration statement and an IPO, along with underwriters who, perhaps, are not doing their due diligence, as we allege, and people get hurt.  You know, our plaintiffs have lost hundreds of thousands of dollars based on these allegations that they themselves cannot verify.

One thing that does bother me -- and first page of their -- of Golden Heaven's reply, they claim, "Oh, investors need to do their due diligence."  They're putting the blame on these investors, where these are U.S. investors that are relying on statements about physical location of parks, about six parks.  That's Golden Heaven's entire business.  Their revenue, as defendants don't dispute, derives solely through

those parks and attendance.  These attendance numbers and the condition of the parks are the key metric of the business, and those as you -- as Your Honor has noted, we have plenty of evidence showing that those key metrics, unfortunately, were sham -- sham numbers.  We have photos detailing how -- you know, the condition of the rides are rusty and in disrepair.

We have statements in the Complaint, of course, that -- where they list all the offerings of these rides, the quality and variety of them, the innovation of them, the quality control.  They allege that they have certain numbers of employees managing these parks daily and going to inspect them and upgrading them and, you know, making sure they're in great condition.  Actually, data now from China's Social Endowment Office shows us that they misrepresented the numbers of employees they hire, as well, by as much as 367 percent.

The fact that these parks' numbers reported in the prospectus exceed the parks' daily maximum capacities by more than double -- this is a plain case of fraud.  I mean, it's -- defendants kind of repeat these half-hearted arguments about "Oh, well, maybe there were other days where the parks were wildly popular."  You know, based on our evidence and the photos, that simply is not the case.

They somehow seem to imply that after the April IPO

maybe there was a sharp decline in these parks' conditions before the November investigation.  That doesn't bear out based on what the investigators actually saw.  They saw that these are in serious disrepair and have been for a long time with overgrown weeds.  This was not a new occurrence.  And if it was, they actually would have a duty to disclose that. You know, our -- that's a whole other issue.  So okay.  If there was a sharp decline, why didn't you tell investors about it in some kind of 8-K filing or, you know, notice filing?  So that just really doesn't hold any water.

I do want to address, as well, defendants' counsel calls into question the Hindenburg research report as a short seller.  These -- I mean, we can write a letter to the Court showing courts consistently rely on these kind of reports. This is nothing new.  I could give you a string a mile long --

THE COURT:  I don't need anything further on that.

MS. DANIELS:  Okay.  Great.  Just making sure.

And of course, we conducted are own independent investigation.  As we allege in the Complaint, the parks were so empty when our investigators went, we couldn't disclose on what days they went because the Chinese officials would know who they were.  That's how few people were there.  They can detain people for espionage in China just for, you know, kind of investigating companies like this.  It really is kind of a

harrowing thing to investigate, and I think, as you noted, we have more-than-enough allegations showing that there was -- there's fraudulent activity here.

I would also like to just say defendants were implying that these investigations occurred over one day. That's not true.  As alleged in the Complaint, the Hindenburg report -- they went to each park -- there's six parks.  They went to each and spent a full day there.  Same with plaintiffs.  So that's 12 days, I mean, on different days. Hindenburg says, "We went on the busiest days," you know, "Saturdays, expecting to find, like, vibrant, lively, you know, family-friendly entertainment, and we saw dystopian hellscapes," which is their word, not ours.  You know, we bring it in the Complaint because it really captures what they found.  And our -- you know, our plaintiffs' investigators concluded the same thing.  So, no, you know, they -- we have other evidence of falsity as well, you know, for the Exchange Act claim.  Of course the parks were empty.

The Social Endowment Office confirms they also misrepresented the number of employees, and even a year prior, they sold all six entities -- Defendant Jin did -- to a related entity for $7.5 million. That is a fraction of the $200 million valuation that occurred for the IPO, which is pretty good evidence that the parks were overvalued.  I think defendants say, "Well, related entities don't have to have

arm's length transactions, doesn't have to be the exact market value," but this kind of disparity really showcases -- probably that's the correct value or more closer value to what the parks are worth, which might just be the land that they're on.  But again, all their revenue derives from park guests, which they wildly overinflated harming investors.

So that's Section 10.  If Your Honor has any other questions about that, I'm happy to answer them.

As for Section 11, defendants cite to *Century Aluminum* as -- you know, as -- claiming that that supports the fact that we have no standing here.  We did rightly dismiss the Section 12 claim; so we're not overreaching here.  We're saying this is -- we do allege that the shares are traceable to this one registration statement.  As *Century Aluminum* says: When all company shares have been issued in a single offering under the same registration statement, this tracing requirement -- it's not an obstacle.  That is the case here.  And in fact, defendants' authority in their reply brief contained two offerings.

So again, where, maybe, there might be an issue of traceability, you might have to allege a little bit more at this stage.  At this stage, as we cite in our brief, alleging, "Okay, there's one registration statement.  You purchased these shares pursuant to that registration statement," that's enough, and anything else would be,

probably, a factual dispute at this point.  What -- where else is he getting the shares?  They seem to imply that because Defendant Jin held -- as an insider held 30 percent of the company's value that somehow those would be not issued pursuant to the statement, or maybe there was insider trading and maybe he procured the shares through some kind of -- I don't know -- private placement, but again, we allege there were -- there was no insider trades.  We have no evidence of that, and I'm sure, if they found that, then they would have put it in their -- you know, their briefs, and we don't see that here.

The other fact that they -- defendants tend to gloss over is this is a Chinese foreign issuer.  They solicited U.S. markets through this document, and then U.S. investors purchased through this document.  Shares that existed before, I mean, if they were on some Chinese exchange -- I mean -- or something -- you know, allegedly like that, that's not what we allege.  He purchased on Nasdaq pursuant to this one registration statement, and really, if you read defendants' authorities, they involve more than one offering. So it does raise these questions about "Okay.  Well, maybe the shares weren't traceable."

The other issue is part of the reason we have that requirement is because we want to make sure that plaintiffs have relied on the correct misstatements; right?

Golden Heaven is repeating the same statements well past the IPO in, like, their annual report issued in February 2024, where they double-down on the same statements.  So it's not like they're correcting statements and then, you know, there's a question of like, "Oh, well, what are you relying on?"  Golden Heaven has maintained that Hindenburg is crazy and that -- you know, their fraudster is basically trying to inject uncertainty into the markets and fear.  It's quite a statement that they were, at least, denying these allegations.  They said more would be forthcoming, "We'll explain in the future," and then, not surprisingly, they never did.  So this kind of public denial and then saying, "Oh, yeah, we're looking into it.  We'll tell you the truth," and then no truth comes out, but other statements, like in their annual report, do come out, have the same statements.

So there's really one offering here -- one universe of statements upon which plaintiffs relied here.  This is the foreign issuer.  This is their access to U.S. markets, and these are U.S. investors harmed.  These U.S. investors, of course, could not verify many of the statements themselves and shouldn't be required to.  That's why they rely on underwriters and auditors and these gatekeepers that come -- utterly failed them here.

And we do allege they -- they claim that our Section 11 claim sounds in only fraud and therefore we need

to meet the fraud standard.  I mean, maybe that could be an argument for Golden Heaven, although it's not because the statements that we claim are misrepresented in the prospectus -- the numbers -- you know, the number of guests, number of employees -- all of that.  That could be done through negligence.  I mean, that -- that's just -- misrepresenting statements or numbers in a prospectus could be done by negligence even with -- for Golden Heaven, but certainly for the underwriters here and the auditors, who had a duty to review the financial information that they were taking in -- they have a duty to provide a valuation figure here.  They have a duty to set the price.  They have a duty to interview. They could have done the minimum here.

I think this is a very clear case of negligence. And we have statements in the Complaint to that effect.  We say, Look, common questions of law and fact exist whether the registration issued was negligently prepared and contained inaccurate statements of material fact or omitted material information.  At paragraph 352 we say these Securities Act defendants had a duty to make a reasonable and diligent investigation, and they failed to exercise reasonable care.

In sum, they didn't do their job.  Their -- these numbers are -- you know, we shouldn't expect investors to, like, go to the Chinese Endowment Office and verify that their -- they hired as many people as they said, or they had

the certain maintenance teams they have, or they have the certain features they have in their parks -- or the numbers. Again, the numbers are wildly inflated, and whether they visited the parks -- they visited the parks 12 days in very peak season and found that this was a sham.  And as the Bloomberg article cites, when the truth finally come out, said, Look, these Chinese scams are pretty common unfortunately.  This isn't, like, a new tactic.

The new thing is our investors were harmed by this, and the fact that they want to kind of shuffle and dance around but not really address the substance of our allegations, which are -- they never addressed these numbers' issues.  They tend to poke at the, arguably, forward-looking statements or puffery in -- when -- later made in, like, press releases or analyst calls.  The numbers in the prospectus are objective and verifiable.  They're not puffery.  They're certainly about present conditions. They're not forward-looking.  They never address -- they never argue the parks are in good condition.  They try to argue maybe the parks had, like, four times the amount of guests the next day just by chance and our investigators missed it, but that doesn't really -- that doesn't pass the lab test here.

THE COURT:  Okay.  All right.  Very good.  Anything else that you'd like to highlight on the Section 11 argument?

MS. DANIELS:  I think that's it, Your Honor. Thank you.

THE COURT:  Okay.  Very good.

I'll give the last word to anyone on the defense side, briefly though.

MR. HUNTER:  Thank you, Your Honor.

Counsel raised the exact points that I was raising in a different way, Your Honor.  The numbers are objective in the registration statement -- or, I'm sorry -- in the prospectus, and they're attacking those numbers based on investigations that were done 7 months and 13 months later.

Now, there was misspeak here.  When I said they visited parks in one day -- there's 12 parks over 12 days. That's fine.  I wasn't playing fast and loose with the Court. It's 12 days, 12 parks, but they visited each park for one day and --

THE COURT:  Six parks.

MR. HUNTER:  Right.  Okay.  I'm sorry.

So they visited each -- I believe they visited each park for one day, and I believe that's in the --

THE COURT:  But there were two investigations. There's the --

MR. HUNTER:  Right.  Okay.  Fair.  That's fair, Your Honor.

The point is, whether it's 7 months out or

13 months out, they're conducting this investigation to attack numbers that were in a prospectus 7 and 13 months ago, and they're saying that is sufficient allegation to support that.

And they're saying, well, we don't -- never did we come out that our numbers are good. We've not argued -- well, we're not arguing anything at a motion to dismiss stage. I don't think that would be appropriate. There's plenty to say, but it's whether or not -- we're looking at whether or not they pled enough here. And if Your Honor looks at the deficiencies in what both the Hindenburg and their investigation focused on and what they're taking the holdings -- the findings of that investigation and what they're trying to infer is fraud by hindsight 7 months ago in a registration statement. That's not adequately pled. The law doesn't support that. The pleading standards don't support that.

And again, I think briefly on the 33 Act claims, and then that's all. Thank you, Your Honor.

THE COURT: All right. Very good. Thank you.

MS. SARDELLA: Yes, Your Honor. Very briefly.

I believe the plaintiff stated that because there was one -- only one offering that somehow the shares could only come from there. I stand by my arguments that there is still a alternative as to where the shares would come from,

particularly since they were purchased, I believe, 8-months-or-so later from the offering.

With regard to the Section 11 claims and the particularity under Rule 9(b), the issue still stands that the -- even with some language of negligence, this isn't laid out distinctively as negligence claims where you have claims that are so steeped in fraud, and I believe our moving papers show that basically substantively the allegations of fraud are repeated in the Section 11 sections, and therefore the claims need to be stated with particularity, and I guess that rebounds back to my colleague's arguments with regard to the particularity of those allegations.

And I think I'll stop there to keep it brief.

THE COURT:  All right.  Thank you.

Ms. Freeland?

MS. FREELAND:  Thank you, Your Honor.

There was a lot brought up that isn't in the Complaint.  So since that's what we're looking at, I just want to bring it back quickly to what is alleged in the Complaint.

The only allegation in the Complaint as to traceability is that the shares were purchased pursuant and/or traceable to the registration statement issued in connection with the IPO.  That's it.  None of the stuff about maybe there was insider trading or there wasn't insider

trading or -- none of that is in the Complaint.

THE COURT:  But why isn't that enough?  We're talking about just a handful of months later.  It's not a situation where it was three years after a major U.S. IPO where you had, you know, different registration statements out there as well and different offerings and rounds.  I mean, why can't I just use my common sense and say they had one big IPO in the U.S.; they issued one registration statement.  Clearly, it's all tied to that.

MS. FREELAND:  I agree, Your Honor.  We would be in a much better position if there were multiple IPOs.

I -- and the distinction here and the answer to the question is because the Complaint itself makes it clear that there were still outstanding and issued shares.  So it's not a situation where the only outstanding and issued shares came from the IPO.  It's a situation where, as the plaintiffs state in their Complaint -- and it's on page -- paragraph 150: (reading) Immediately before and after the IPO, Defendant Jin owned 15 million ordinary shares of Golden Heaven, constituting 30 percent of Golden Heaven's total outstanding shares before the IPO.

So there are, clearly, outstanding shares.  If plaintiff wanted to say, "Well, those outstanding shares didn't make it into the market.  There were no filings that would show that or allow that," they should have done that.

They haven't don't that.  So instead, what the Court is left with is a case where there are other outstanding shares that could have been the ones that plaintiff purchased, and so that's -- if plaintiff believes that they can meet Rule 11 and allege these additional factual allegations, then they should replead and do so, but the Complaint, as it is written right now, does not do that.

THE COURT:  Okay.  All right.  Understood.

MS. FREELAND:  Thank you, Your Honor.

THE COURT:  Thank you.

Anyone else?  No.

All right.  The matter will be deemed submitted, and we'll work on an order promptly.

Thank you, everyone.  Have a good day.

MR. HUNTER:  Thank you, Your Honor.

MS. SARDELLA:  Thank you, Your Honor.

(Proceedings adjourned at 11:17 a.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa                    February 10, 2025
Julie Messa, CET**D-403            Date
Transcriber